## 2. AMENDED NOTICE OF DEPOSITION.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:13-CV-270-D

VICTORIA L. TAYLOR, individually and as executrix of the estate of BRANDON C. TAYLOR, and as Mother and Guardian Ad Litem of minor children CALEB CHRISTOPHER TAYLOR and BRYSON LOUIS TAYLOR,

    Plaintiff,

v.

MCGILL ENVIRONMENTAL SYSTEMS OF NC, INC.,

    Defendant.

## AMENDED NOTICE OF DEPOSITION
### (Rule 30(b)(6))

Plaintiff Victoria Taylor hereby serves Plaintiff's notice of deposition under Fed. R. Civ. P. 30(b)(6) and asks that Defendant McGill designate one or more corporate representatives to testify regarding the topics that are listed below. This deposition is scheduled for **Wednesday, January 7, 2015** starting at **10 a.m.** at the Ragsdale Liggett law firm, located at 2840 Plaza Place, Suite 400, Raleigh, NC 27612. The deposition will be transcribed by a qualified court reporter and may be videotaped.

1

## DEPOSITION TOPICS:

### A. Tim Artis Incident:

1. The identity of the McGill driver present at the time of the injury to Tim Artis which occurred on or about February 20, 2010, confirming that this driver was Ricky Robinson. (For background, see Smithfield_McGill 3438-44); the identity/number of the McGill tanker present at the time of the injury to Tim Artis and confirming it was a McGill tanker; and identifying, in the driver dispatch logs and bills of lading produced in discovery by McGill, which ones reflect this tanker pick-up.

2. The nature of any discussions or communications that McGill's driver Ricky Robinson had with supervisors or managers or anyone else at McGill regarding the injury to Tim Artis, how it occurred and what caused it.

3. Any knowledge, information or documents that any McGill employees or managers received or prepared regarding the injury to Tim Artis; McGill's investigation, if any, of the injury to Tim Artis and of the safety of its tanker pick-up practices and equipment in light of that injury; McGill's knowledge at any time regarding the cause of Mr. Artis' injury; any McGill knowledge or discussions regarding any testing, analysis or monitoring results of the air in or around McGill tankers after the Tim Artis injury.

4. Any knowledge that any McGill employees or managers had of any changes to tank loading procedures after the injury to Tim Artis (such as use of a harness, or any other changes either by McGill or by Smithfield in the tanker pick-up process).

### B. Ulysses Boykin Incidents:

5. The identity of the McGill driver present at the time of the injury to Ulysses Boykin which occurred on or about January 19, 2012; confirming who the driver was. (For background, see Smithfield_McGill 3446-49); the identity/number of the McGill tanker present at the time of the injury to Ulysses Boykin; confirming which tanker it was; identifying in the driver dispatch logs and bills of lading produced in discovery by McGill, which ones reflect this January 19 tanker pick-up; and the nature of any McGill tanker visits to the Smithfield Clinton facility on January 19, 2012 including details as to any tankers that went to the facility that day or night, the tanker identities/numbers, and the McGill driver identities.

6. The identity of the McGill driver present at the time of another injury incident regarding Ulysses Boykin which occurred on or about the early morning hours of January 24, 2012, after midnight of January 23 and going into the early morning hours of January 24; identifying in the driver dispatch logs and bills of lading produced in discovery by McGill, which ones reflect this January 23-24 tanker pick-up; and the nature of any McGill tanker visits to the Smithfield Clinton facility on January 23 or 24, 2012 including details as to any tankers that went to the facility, the tanker identities/numbers, and the McGill driver identities.

7. The nature of any discussions or communications that McGill's driver Ricky Robinson (or any other McGill driver) had with supervisors or managers or anyone else at McGill regarding any January 2012 injuries to Ulysses Boykin.

8. Any knowledge, information or documents that any McGill employees or managers received or prepared regarding any January 2012 injuries to Ulysses Boykin after they happened; McGill's investigation, if any, of any injuries to Ulysses Boykin and of the safety of its tanker pick-up practices and equipment in light of them; McGill's knowledge at any time regarding the cause of Mr. Boykin's injuries; and any McGill knowledge or discussions regarding any testing, analysis or monitoring results of the air in or around McGill tankers after the Boykin injuries.

9. Any knowledge that any McGill employees or managers had of the changes to tank loading procedures after any January 2012 injuries to Ulysses Boykin.

**C. Brandon Taylor Incident:**

10. McGill's investigation, if any, of the February 2012 death of Brandon Taylor; McGill's knowledge at any time regarding the cause of Mr. Taylor's death.

11. McGill's investigation, if any, of the safety of its tanker pick-up practices and equipment in light of that fatality; any knowledge that any McGill employees or managers had of the changes to tank loading procedures after the fatality.

12. The details regarding any decision or action by McGill to stop sending tankers to the Smithfield Clinton facility for pick-ups from overhead storage tanks after the death, including a) why the decision was made or the action was taken; b) when the decision was made or the action was taken; c) who was involved in making the decision or taking the action.

13. Whether McGill agrees with or contests the accuracy of any of the findings and statements in the NC OSHA/NC Department of Labor investigation reports that were generated after the death of Brandon Taylor (see Dep. Ex. 21); including:

   a. that "[a]s the sludge fills the tanker, hydrogen sulfide gas from the sludge is displaced up out of the tanker into the breathing zone of the wastewater operators";

   b. that "[i]nterviews with McGill's truck drivers revealed that .... [o]nce they arrived at McGill and backed-up to the containment area, they would climb on top of the tanker to open the hatch, hold their breath, and step back as gas escaped (just like opening a bottle of soda";

   c. that "[t]he gas smelled like rotten eggs to the 20th time"; and that the tanker "would release an awful rotten egg smelling gas" when the driver "opened the hatch on top of the trailer";

   d. that drivers "always tried to be up-wind from the hatch .... [t]o avoid the gas";

   e. that "truck drivers of McGill ... were being exposed to the same hazards off-loading the wastewater sludge at their compost facility located in Rose Hill, as were the wastewater operators at Smithfield Packing Company, Inc., that resulted in a fatality";

f. that "employees were exposed to hydrogen sulfide gas from wastewater sludge while unloading semi-tanker trailers from Smithfield Packing's wastewater facility" and that McGill "did not evaluate whether there was a respiratory hazard" to those employees;

g. that "the hazard exists for an employee to be exposed to H2S gas and asphyxiate which could result in death";

h. that McGill was "aware of the potential generation of dangerous gases such as methane and hydrogen sulfide gas from organic material while making compost";

i. that "gas would escape from the hatch" when McGill drivers would open it;

j. investigators found that McGill should "develop and implement a confined space policy, and post danger signs to warn employees"; and

k. that "[t]he hazard exists in that an employee could unknowingly enter a confined space which could result in engulfment or asphyxiation from toxic gas such as hydrogen sulfide resulting in death."

14. Whether McGill contests the accuracy of any other findings, statements or conclusions found in the NC OSHA/Department of Labor reports after the death.

15. Any information that McGill may have regarding whether Brandon Taylor asked for a respirator to wear at any time before his death; and regarding whether Mr. Taylor ever asked Smithfield supervisors for a respirator or other breathing protection apparatus to use while loading the sludge into the tanker trailers.

**D. Hydrogen Sulfide, Poisonous Gases; Testing:**

16. McGill's corporate knowledge, if any, of the dangers of hydrogen sulfide and of other poisonous gases prior to the death of Brandon Taylor (including but not limited to the facts and incidents involving Robert Jugger, Wilbur Fennell, Aaron Cromartie, Fred Hayes and Woody Gillis).

17. McGill's training and education and instruction of its drivers, if any, on the dangers of hydrogen sulfide and other poisonous gases prior to or after the death of Brandon Taylor; whether prior to or after the death, McGill ever trained its drivers about the dangers of poisonous gas or to warn others going up on its trucks; whether the McGill drivers were trained about the dangers of gases that came out of the hatch of the tanker, at any time.

18. Whether McGill ever did testing or monitoring, or was aware of testing or monitoring, for hydrogen sulfide or for other dangerous gases such as ammonia or methane at its compost facilities (including in NC, Virginia, Ireland or anywhere else) or in or around its tankers or its other vehicles or equipment such as trailers and dewatering boxes.

19. McGill's corporate policy, if any, regarding whether other companies are allowed to test the air inside of its tankers or around its tanker hatches or to put a probe down into the

open hatch of the tanker without McGill's knowledge or permission; and McGill's corporate policy, if any, regarding whether McGill requests to be informed of the results of any testing of the air inside of its tankers or around its tanker hatches.

20. McGill's knowledge, if any, regarding any times that anyone from any Smithfield facility or at the direction of Smithfield tested the air inside of any of its tankers or around its tanker hatches or to put a probe down into the open hatch of the tanker, including a) when the testing was done; b) why it was done; c) where it was done; and d) what the results were.

21. Whether McGill managers asked for, were told, or otherwise learned of the results of any testing of the air inside of its tankers or around its tanker hatches at any time; whether McGill ever made any efforts to test the air inside of a tanker for presence of poison gases.

### E. Agreements/Arrangements with Smithfield:

22. McGill's agreements and arrangements with Smithfield with regard to McGill sending a) tankers, b) open top trailers, c) dewatering or belt press boxes or equipment, and/or d) support personnel, to the Smithfield slaughterhouse in Clinton NC; McGill's duties under its agreements with Smithfield pertaining to the Smithfield Clinton facility; and McGill's position regarding was a written contract in place with Smithfield at the time of the death.

23. Whether McGill provided or sent dewatering boxes/trailers, belt presses, other equipment, or employees to operate or assist with equipment, over to the Smithfield slaughterhouse in Clinton NC at any time.

24. Any efforts by McGill management to come out to the Smithfield Clinton site to observe, investigate or impact the tanker loading process from the overhead storage tanks so as to ensure it was safe to do.

25. Whether McGill used tankers to drain slaughterhouse waste sludge from overhead storage tanks at any facilities besides the Smithfield Clinton facility at any time; confirmation that McGill did not do so anywhere else.

26. Whether use of the overhead storage tanks/tanker method increased in the weeks leading up to the death due to problems with the Smithfield belt press at Clinton.

### F. Safety devices, warnings; other safety issues:

27. Any efforts by McGill to outfit its tankers with the following items: a) any sensor, gauge or other instrument or device to inform someone filling the tanker of how full it was getting or to alert them once it got full; b) any sight glass or porthole to allow someone filling a tanker to see how full it was getting; c) any equipment that would keep poisonous gases from escaping out of the top of an open tanker hatch; d) any poison gas or hydrogen sulfide gas placards or warnings; and e) any confined space placards or warnings.

28. Any efforts by McGill to buy or acquire handheld/portable air monitors that could be used to detect when there was poisonous gas.

- 5 -

29. The nature of any McGill rules, practices or procedures regarding the cleaning out of the inside of tankers before going to pick up each load from Smithfield.

30. Any efforts by McGill's management to test the waste in the form it came out of the bottom of the four overhead storage tanks, to see what chemicals and gases were in it and to see if its tanker pick-up procedure was safe; and any testing of the waste as it came out of the McGill tanker after the pick-up from Smithfield, when it was drained back at the McGill compost facility, to see what chemicals and gases were in it.

31. Any efforts by McGill to ensure the safety of any individuals who worked on top of McGill tankers and around tanker hatches.

32. Details regarding the prior injuries, accidents, OSHA 300 logs, OSHA citations and inspections, Department of Transportation information of accidents, and other safety issues reflected by available records produced during discovery (including but not limited to the OSHA investigations, citations and penalties described in the OSHA records produced and summarized in the proposed first amended complaint at paragraphs 96-128, filed at Docket 34-2).

### G. Permit issues:

33. The nature of McGill's permits with NC agencies; which specific documents McGill cites as reflecting a proper permit for the Delway facility as of the date of the death.

34. Whether McGill's use of tankers to pick up waste from overhead storage tanks at the Smithfield Clinton plant was in compliance with its permits or allowed for by the permits; whether McGill believes its permit allowed it to pick up anaerobic waste; whether McGill believes its permit allowed it to use tankers to pick up waste.

### H. McGill information for punitive damages claim (See NCGS § 1D-35(2)(h) & (i)):

35. McGill's profits from hauling waste from 2010-14; McGill's profits from hauling waste from Smithfield from 2010-14; McGill's revenues from 2010-14; and McGill's net worth from 2010-14.

This the 22nd day of December, 2014.

                                    s/Mona Wallace
                                    Mona L. Wallace (N.C. Bar No. 09021)
                                    John Hughes (N.C. Bar No. 22126)
                                    WALLACE & GRAHAM, P.A.
                                    525 N. Main St.
                                    Salisbury, NC 28144
                                    Tel: 704-633-5244
                                    mwallace@wallacegraham.com
                                    jhughes@wallacegraham.com
                                    Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned has served the foregoing document by United States mail and email as reflected below:

Service via US Mail and email:

Angela Allen
Mary Webb
RAGSDALE LIGGETT PLLC
2840 Plaza Place, Suite 400
P.O. Box 31507 (27622-1507)
Raleigh, NC 27612
aallen@rl-law.com
mwebb@rl-law.com
Counsel for Defendant McGill Environmental Systems of N.C., Inc.


This the 22nd day of December, 2014.

                                          s/Mona Wallace
                                          Mona L. Wallace (N.C. Bar No. 09021)
                                          John Hughes (N.C. Bar No. 22126)
                                          WALLACE & GRAHAM, P.A.
                                          525 N. Main St.
                                          Salisbury, NC 28144
                                          Tel: 704-633-5244
                                          mwallace@wallacegraham.com
                                          jhughes@wallacegraham.com
                                          Counsel for Plaintiffs