# 6. Witness Affidavits.

## AMENDED AFFIDAVIT OF WILBUR FENNELL

Being duly sworn upon my oath, I swear and affirm the following:

1.     My full name is Wilbur Fennell. I am a citizen of the State of North Carolina. I am over eighteen years old. I signed an affidavit that was prepared based on information I gave by telephone. I have now provided more information and so I am now signing this amended affidavit.

2.     I worked for McGill Environmental from 1999 and left the company in about 2004. I worked as a truck driver. I drove both the open top trailers for McGill, and the tankers. The tankers were used to haul wet sludge.

3.     When I worked at McGill, the truck drivers like myself had to open the hatch at the top of the tanker for various reasons. For example, we would open the hatch to release the pressure and let air in, so we could drain out the waste.

4.     When we opened up the hatch, often there was a bad rotten egg smell that I smelled. The rotten egg fumes were very bad and made it harder to breathe. Gas would come out of the open hatch. This happened to me at the Smithfield plant in Tar Heel, NC.

5.     The McGill Delway plant had a significant problem with fumes and gases. Management was aware of these problems. Once I was working at the Delway facility, and another worker named Aaron Cromartie climbed up out of a tanker to open the hatch, and fumes shot out everywhere. On another occasion, I was sitting in a McGill break room at the office at Delway, and a lid blew open on the top of a tanker because of the stored-up gas. There were other instances of gases and fumes coming from the tankers located at the Delway facility.

6.     A McGill worker named Robert Jugger got sick when he was overcome by fumes while working at Delway and the Sampson County EMS came out to get him. Everyone knew he was overcome by fumes and gases.

7.     One or more times, when I was opening up the hatch on the McGill tanker, the gas and fumes came out and hurt my eyes. I have been shown a McGill form that says I was hurt because of "eyes splashed by liquid" in 2003. That record is consistent with my recollection of being hurt in my eyes from the gas fumes that came from out of the tanker. This event happened at the Tar Heel Smithfield facility. At that facility, we dropped off the tankers and then picked them up filled, and brought them back to McGill's Delway facility. We would have to check the hatch before we drove them off the Smithfield property. The gases could build up in the heat of the day in the sealed space of the tanker. In 2003 when I went up on the tanker and opened the tanker hatch, the gas came out of the hatch and into my face injuring my eye. No one informed me about the dangers of the gases and the fumes coming out of the tankers.

8.     McGill managers knew that the gas fumes and substances from in the tanker hurt people. For example, they reported my injury on their 2003 form. However, during the time I

1

worked there, McGill never made improvements to get rid of the danger. When I was injured I reported it to McGill management.

9. Most tankers have a release valve where you can release the pressure. But, these McGill tankers were so old that they did not have one. Also, some tankers can have a clear strip on the side, or a gauge, allowing you to see how full they get. However the McGill tankers did not have this either.

10. Many times when I was draining sludge into a tanker or out of a tanker and working near the open hatch, the fumes came from the open tanker hatch into my face. When this happened it made it hard to breathe and the fumes got in my eyes. All McGill management had to do was come out and watch us loading and draining the tankers to see the problem.

11. McGill did not give us proper equipment to fully clean out the inside of the tankers in between when we got each load of waste sludge.

12. My recollection is that the ladder on the side of the McGill tankers was over on the passenger side.

13. On the tankers, there was no loading gauge or porthole or other indicator on the tanker that would alert you to how full it was. You could not see how much was going into the tanker if you were on the ground looking up. You could not look at any gauge on the side.

14. I preferred to work with the open top trailers instead of the tankers. The open top trailers did not keep the waste in a sealed container and were less dangerous.

15. During my time at McGill, the company never trained me about what the chemical "hydrogen sulfide" was.

16. I do not recall there being any "permit confined space" warnings on the tankers.

17. McGill never told me that hydrogen sulfide and other dangerous gases could come out of the tanker.McGill never told us that we could be at risk or other people who went on the tankers were at risk. McGill never instructed us to warn other people who went near the hatch, or to keep them away from it.

18. I never saw a warning label on the side of the tankers saying there was a poison gas risk.

19. If McGill had provided a way to keep vapors from coming up out of the hatch, that would have been safer, since that would have kept fumes and vapors from coming up out of the tanker.

20. If McGill would have provided me with a poison gas monitor to wear before I went up onto tankers, I would have worn such a monitor, to help avoid an injury. If McGill had

2

given us a monitor to make other people use if they went on our tankers, I would have made them use it as well.

21. If McGill had provided a gauge or a porthole on the side of its tankers to show how full the tanker was getting inside, that would have helped me as well. It would have also helped other people loading the tanker.

22. If McGill had instructed me to wear a respirator before climbing up on its tankers, or to tell other people to do so, I would have done so, for safety.

23. I depended on McGill to provide me with adequate safeguards and warnings when I climbed up onto tankers. If there was a chance that bad chemical gases could come out of the hatch, I would have expected McGill to prevent that from happening and to warn me. I also would have expected McGill to warn other people who went near the hatch on its tankers.

Wilbur Fennell

Subscribed and sworn before me this 16th day of November, 2014.

My Commission Expires: April 13 -19

NOTARY PUBLIC

3

## AFFIDAVIT OF AARON CROMARTIE

Being duly sworn upon my oath, I swear and affirm the following:

1.     My full name is Aaron Cromartie.  I am a citizen of the State of North Carolina.  I am over eighteen years old.

2.     I worked for McGill Environmental from 1998 and left the company on or about November, 2000.  I worked as a loader operator.  I was involved in various tasks including mixing materials with liquids that came in to make compost.  My job duties also required me at times to have to climb on top of the McGill tankers to unload them and to clean them out.

3.     When I worked at McGill, the tankers that came in often had liquids in them which would have to be unloaded.  This would be done by hooking up a hose to the tanker to drain the contents out of the tanker.  The hose had a pump and sometimes the pump was not strong enough to get the waste out.  This would require us to have to climb up the ladder, which was on the passenger side of the tankers, stand over the hatch on top of the tanker, open the hatch, and put a hose into the hatch.

4.     On occasions when we opened the hatch, fumes and gases would come out of the hatch and the fumes and gases would get in our faces and take our breath away.  We were not told exactly what was in the waste in the tankers, but there would at times be a strong odor.  At times, the fumes would smell like rotten eggs.  Sometimes you could also see liquid sloshing in the tanker.  The fumes that came out smelled very bad.  We were not provided a respirator to wear.

5.     I was most concerned for my health when I worked the night shift.  When I worked the night shift, I would have to get on the tanker at night and there was very little lighting which made it harder to do the work.  The employees complained of having to drive front end loaders around the pits at night without having proper lighting for night driving and unloading.  McGill was aware that the employees were worried about working with the waste including unloading it from the tankers at night without proper equipment and lighting.

6.     The employees of McGill also complained to McGill about not having proper respiratory protection when we had to unload the liquid waste into the pits as were worried that someone might be seriously hurt from breathing in the fumes and also, from being on top of a tanker without fall protection, with gases and fumes coming into your breathing zone.  I believe that OSHA investigated some of our complaints about McGill making us work around the waste coming out of the tankers, which had strong odors and fumes, without adequate respiratory protection.

7.     We also complained and told OSHA and McGill about our lack of training.

8.     I have reviewed the attached pages of OSHA records provided to me by Mrs. Wallace and I believe these OSHA records confirm how worried we were about our safety and the safety of others doing business with McGill.

1

9.     There was little or no training given to us. McGill bought old equipment and I was asked to drive equipment that had no brakes. I refused to do it.

10.    When McGill bought the tankers, it bought them used, and they were old. I do not recall any training given regarding any dangers associated with our unloading them or washing them out even though OSHA had been out there because of our complaints.

11.    We also had problems with fumes and odors and gases we were working in and around the bays. We didn't know what was in what we were handling, but at times it would get foggy and we would have trouble seeing and catching our breath. McGill did not give us respirators and we had to breathe in and work around waste and had no idea what was in it.

12.    We took in materials that were combustible. Once we had a problem with a pile of material that we had taken in burning or sizzling. This compost pile had been burning for several weeks at least. We were told to drive up onto the pile with water in a bucket to dump it on the material to put out the remaining fire, but I refused.

13.    Some of the materials that we took in created gases when we mixed them. For example, we worked with a kind of burnt ash. When we mixed the substance, it would create bad fumes and gases including ammonia. I complained about the bad fumes but the company would not do anything about it and ignored our complaints. McGill did not tell its employees what was in the materials that we were taking in and being exposed to which were creating the odors and fumes.

14.    We took in materials from various sources including Raleigh. We took in human waste from Raleigh and we were concerned about working around it without protection. I insisted on and made McGill provide me a hepatitis shot as I was worried about getting sick from being exposed to this nasty waste with no protection.

15.    I remember that an employee, Robert Jugger, was overcome by fumes and taken away by an ambulance. To the best of my recollection, he was injured in 2003 at Delway. He was operating a loader when he was overcome by the gases and fumes that we had been complaining about. He was taken by ambulance to the best of my recollection to the local hospital. Even after he was taken away, and despite our complaints, we were not provided respirators. And, I don't recall ever seeing anyone doing any air testing around where I was working.

16.    There were a lot of problems and people getting hurt at the plant because of McGill's lack of concern for safety. I even recall that a guy who was visiting the plant fell in the open pit and had to be pulled out.

17.    McGill did not care about our safety or the safety of others. One time, another employee named Fred Hayes was digging in the compost and got covered up in it and they had to dig him out.

2

18.    I affirm that I have reviewed this affidavit and that it is true to the best of my knowledge.

This the 7th day of November, 2014.

*Aaron Cromartie*
Aaron Cromartie

Subscribed and sworn before me this 7th day of November, 2014.

My Commission Expires: April 13, 2019

NOTARY PUBLIC

3.



**NCDOL**
N.C. Department of Labor

CHERIE K. BERRY
COMMISSIONER

DIVISION OF OCCUPATIONAL SAFETY AND HEALTH
BUREAU OF COMPLIANCE

August 27, 2004



RE:     OSH Inspection      307903005
        OSH Complaint       205077498

Dear ▆▆▆▆▆▆▆▆▆▆:

Following your complaint, a compliance officer from the Bureau of Compliance, Division of Occupational Safety and Health conducted an inspection of McGill Environmental Systems in Rose Hill, NC on 07/09/2002.

Enclosed are copies of citations resulting from the inspection. Your complaint (itemized and underlined) is restated below, followed by our findings.

1.  <u>Employees are driving front end loaders (4 Each) on the site without having proper lighting for night driving and proper braking ability.</u>

See Citation One item 2a,b

If you do not agree with our investigation results, you may seek further clarification from the District Supervisor or Bureau Chief. If dissatisfaction with the determination still remains after further conversation with the District Supervisor or Bureau Chief, you also have the right to an informal review by the Director's Office. A review may be obtained by submitting a written statement of your position to the Director's Office at the following address:

> NC Department of Labor
> OSH Director's Office
> 1101 Mail Service Center
> Raleigh, NC 27699-1101

1200 NORTH 23RD STREET, SUITE 205 • WILMINGTON, NORTH CAROLINA 28405-1824
(910) 251-2676 • FAX: (910) 251-2854

B.Taylor004375

Your action on behalf of Safety and Health in the workplace is sincerely appreciated.

Sincerely,

Paul Vogel fce

Howard J. Laurie
Area Director

HJL/jf8

Enclosure (if appropriate)

B.Taylor004376

 305730996



# Notice of Alleged Safety or Health Hazards
Tue Nov 5, 2002 3:01pm

| | | | | |
|---|---|---|---|---|
| | | **Complaint Number** | | 204230460 |
| **Establishment Name** | McGill Environmental Systems | | | |
| **Site Address** | 1100 Herring Road, Rose Hill, NC 28458-7618 | | | |
| | **Site Phone** (910) 532-2539 | | **Site FAX** | (910) 532-2542 |
| **Mailing Address** | 1100 Herring Road, Rose Hill, NC 28458-7618 | | | |
| | **Mail Phone** (910) 532-2539 | | **Mail FAX** | (910) 532-2542 |
| **Management Official** | ████████████████ | | **Telephone** | |
| **Type of Business** | Compost Mfg. | | **Ownership** | |
| **Primary SIC** | 2875 | | **Primary NAICS** | 325314 |

**HAZARD DESCRIPTION/LOCATION.** Describe briefly the hazard(s) which you believe exist.  Include the approximate number of employees exposed to or threatened by each hazard.  Specify the particular building or worksite where the alleged violation exists.

**DESCRIPTION:**

SoBi.

1. Open sludge pit, approximately 6-7' deep, is not guarded by railing to prevent employees from falling into the open pit.

2. Electrical equipment throughout the facility, such as the conveyors, is not properly grounded. ██████████████

3. No guards in place for the conveyors used to convey the compost material. ok

4. First aid kits are not properly stocked. ok

**LOCATION:**
Pit area for #1
Throughout the facility for #2 & #3

5. NO TRAINING FOR EMPLOYEES USING FORK LIFTING WORKERS

6. FIRE EXTINGUISHER NOT INSPECTED

7. LIGHTING ON LOADERS DOES NOT WORK

8. EMPLOYEES HAVE NOT BEEN TRAINED TO OPERATE LOADERS

OSHA-7 (Rev. 7/02)

B.Taylor004639

NC Department of Labor
Division of Occupational Safety and Health

Notice of Alleged Safety or Health Hazards
Wed Jul 3, 2002 1:56pm

 
Teacher
7-3-02

| | | Complaint Number | 204009898 |
|---|---|---|---|
| Establishment Name | McGill Environmental Systems | | |
| Site Address | 1100 Herring Road, Rose Hill, NC 28456-7618 | | |
| | Site Phone (910) 532-2539 | Site FAX | (910) 532-2542 |
| Mailing Address | 1100 Herring Road, Rose Hill, NC 28456-7618 | | |
| | Mail Phone (910) 532-2539 | Mail FAX | (910) 532-2542 |
| Management Official | ▓▓▓▓▓▓▓▓▓ | Telephone | |
| Type of Business | Fertilizer Mfr | | |

HAZARD DESCRIPTION/LOCATION. Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

DESCRIPTION:

1.   Lack of PPE available for unloading liquid bio-solid waste products in pit.  ⊘ K

2.   Inadequate lighting for work at night.   O 12

3.   The processing plant area has no bathroom facilities.  (Port-A-John located 100 yards away).

4.   No eye wash available at facility.  ⊬

LOCATION:
At facility., processing plant.

OSHA-7(Rev. 3/96)

B.Taylor004802

Case 7:13-cv-00270-D   Document 56-6   Filed 02/17/15   Page 11 of 33

STATE OF NORTH CAROLINA

COUNTY OF 

### AFFIDAVIT OF MARIE JUGGER

Being duly sworn upon my oath, I swear and affirm the following:

1.  My name is Marie Jugger. I am a citizen of the State of North Carolina. I am
over eighteen years of age.

2.  I am the widow of Robert Jugger. My husband, Robert, worked for many years
at McGill Environmental. He is now deceased, having died from lung problems including lung
cancer.

3.  My husband worked at various jobs while employed by McGill Environmental at
the Delway, Rose Hill facility. Prior to working for McGill, he was healthy and had no lung
problems. He was seriously injured from inhalation of fumes and gases while working for
McGill and I believe that this ultimately contributed to his death.

4.  My husband did a lot of different jobs at McGill including working as a front-end
loader. On March 31, 2003, while running the front-end loader to put the wastes into the pits,
he was taken by ambulance to the hospital because he was overcome by fumes and gases. He
was hospitalized and stayed out of work for over a month.

5.  Robert hired a lawyer to represent him against McGill in a workers' compensation
action filed in May 2003. I went with him to see the lawyer. The case was settled by McGill.

6.  I am attaching documents that I have given Ms. Wallace's office permission to
use and to share with others. These documents show what I know, which is that my husband was
working on his loader when he was overcome by the gases from the wastes; he had difficulty

breathing, and he collapsed. He was hospitalized but his breathing always bothered him up until the day he died.

7.    We sought treatment for him from Dr. Dalton B. Dove in Goldsboro, North Carolina. Dr. Dove told us that it was the gases that my husband was working around that caused his lung problems and his collapse at the work site.

8.    Dr. Dove also advised my husband that he should be wearing a mask to protect him from exposure to particulate matter at his job. He acknowledged that a mask would not protect him from the gases such as ammonia. To my knowledge, my husband was never given a respirator.

9.    Copies of my husband's medical records from Dr. Dove's office, which include the information contained in the above-two paragraphs, were given to McGill during the course of the workers' compensation claim.

This the 11th day of November, 2014.

_Marie Jugger_
Marie Jugger

Subscribed and sworn before me this 11th day of November, 2014.

My Commission Expires: _April 13, 2019_

_[signature]_ (seal)
Notary Public

322816

IC File #: _____

Emp. Code #: _____

Carrier Code #: _____

Employer FEIN: _____

# NOTICE OF ACCIDENT TO EMPLOYER AND CLAIM OF EMPLOYEE, REPRESENTATIVE, OR DEPENDENT (G.S. 97-22 THROUGH 24)

*This IC File # is the unique identifier for this claim. It will be assigned by representative and is to be referenced in all future correspondence.*

The Use Of This Form Is Required Under The Provisions of The Workers' Compensation Act

Robert Jugger
Employee's Name

114 Pastor Branch Rd.
Address

Rose Hill,        NC 28458
City              State    Zip

010 282-9964
Home Telephone

(   )
Work Telephone

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  ☒M ☐F  11/12/1944
Social Security Number    Sex    Date of Birth

McGill's Environment  910532-2539
Employer's Name              Telephone Number

POBox61,Harrells,NC 28444
Employer's Address        City    State    Zip

Zenith
Insurance Carrier

**EMPLOYEE** – This form must be filed with the Industrial Commission within two years of the date of injury or occupational disease or your claim may be barred. Notice shall be given to the employer as soon as the accident occurred or as soon thereafter as practicable and within 30 days. (This form should also be used for occupational disease claims; however, for asbestosis, silicosis and byssinosis, Form 18B is to be used.)

Notice is hereby given, as required by law, that the above-named employee sustained an injury or contracted an occupational disease, described as follows: 7pm on 3/31/03 at Delway, Duplin . Describe the injury or occupational disease,
                              Time of Injury   Date (Received)   City and County
including the specific body part involved (e.g., right hand, left hand) Heart, lungs & airway
Describe how the injury or occupational disease occurred: Got off loader and walked through
a cloud of chemicals.

Occupation when injured: Equip.Operator  Nature of employer's business: Disposal

Disability began: 3/31/03    Return to work date or period of estimated disability: unknown
                   Date

Weekly wage: $380.    Number of hours worked per day: 8    Days worked per week: 5

**EMPLOYER:** This notice is being sent to you in compliance with requirements of the North Carolina Workers' Compensation Act, in order that the medical services prescribed by the Act may be obtained; and, if disability extends beyond 7 days duration, or if death ensues, compensation may be paid according to law.

Robert Jugger
Signature of (Check One) ☒ Employee - Attorney,              910 282-9964
            Representative, or 'Dependent                     Telephone Number

114 Pastor Branch Rd., Rose Hill, NC  28458        5/21/03
Address                    City    State    Zip    Date Completed

**NOTE** – If injured is unable to sign this, another may sign for him. This form should be typewritten if possible. Employee should retain one signed copy of this notice, mail one signed copy to Industrial Commission at the address below, and furnish employer with one signed copy.

For IC use ONLY
Nature _____
Body _____
Cause _____
SIC _____
Coder _____

FORM 18
2/01
PAGE 1 OF 1

FORM 18
INDUSTRIAL
MAY 28 '03
COMMISSION

MAIL TO:

NCIC - STATISTICS SECTION

4334 MAIL SERVICE CENTER
RALEIGH, NORTH CAROLINA 27699-4334
MAIN TELEPHONE: (919) 807-2500
OMBUDSMAN: (800) 688-8349

North Carolina Industrial Commission

*I - m9*

IC File # 322816
Emp. Code # 787700
Carrier Code # 474-00
Employer FEIN 56-17457T

Carrier File # N08015839
The I.C. File # is the unique identifier for this injury. It will be provided by return letter and it to be referenced in all future correspondence.

# EMPLOYER'S REPORT OF EMPLOYEE'S INJURY OR OCCUPATIONAL DISEASE TO THE INDUSTRIAL COMMISSION

The filing of this report by an employer is required by law. It does not satisfy the employee's obligation to file a claim.

The Use Of This Form Is Required Under The Provisions Of The Workers' Compensation Act

JUGGER, ROBERT
Employee's Name
114 PADERT BRANT RD
Address
ROSE HILL                    NC      28458
City                         State   Zip
(910) 282-9984
Home Telephone               Work Telephone
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        ☒ M ☐ F    11/12/1944
Social Security Number  Sex    Date of Birth

MCGILL ENVIRONMENTAL SYSTEMS        (910) 532-2539
Employer's Name                     Telephone Number
PO BOX 81               HARRELLS    NC      28444
Employer's Address      City        State   Zip
Zenith Insurance Company (NC)   03361-000-000
Insurance Carrier               Policy Number
P.O. Box 25700          Charlotte   NC   28228
Carrier's Address       City        State  Zip
(704) 531-8764          (704) 357-7453
Carrier's Telephone Number      Fax Number

| | | |
|---|---|---|
| **Employer** | 1. | Give nature of employer's business  Air & water resource & solid waste mgmt |
| **Time And Place** | 2. | Location of plant where injury occurred 1100 HERRING RD. ROSE HILL, NC |
| | | County___ Department___ LOADER ___ State if employer's premises ___Yes |
| | 3. | Date of injury 03/31/2003  4. Day of week Monday Hour of day ___A.M. 8:00 P.M. |
| | 5. | Was employee paid for entire day ___No  6. Date disability began ___ A.M. P.M. |
| | 7. | Date you or the supervisor first knew of injury 04/10/2003  8. Name of supervisor LARRY WALKER |
| **Person Injured** | 9. | Occupation when injured  LOADER |
| | 10. | (a) How long employed by you 1 yrs 2 months (b) Wages per hour $ |
| | 11. | (a) No. hours worked per day ___ (b) Wages per day $ 0.00 (c) No. of days worked per week 5 |
| | | (d) Avg. weekly wages w/overtime $0.00 (e) If board, lodging, fuel or other advantages were furnished in addition to wages, give estimated value per day, week or month. $ |
| **Cause And Nature Of Injury** | 12. | Describe fully how injury occurred and what employee was doing when injured WHILE WORKING HE HAD DIFFICULTY BREATHING, ABSORPTION, DIGESTION, OR INHALATION |
| | | (Statement made without prejudice and without vouching for correctness of information contained therein) |
| | 13. | List all injuries and specify body part involved (e.g. right hand or left hand) ASPHYXIATION, 0354 BODY SYSTEM AND MULTIPLE BODY SYSTEMS |
| | 14. | Date & hour returned to work ___ at : .M. 15. If so, at what wages 30.00 |
| | 16. | At what occupation  17. Are you continuing the employee's salary in full N/A |
| | | Was employee treated by a physician Y |
| **Fatal Cases** | 18. | Has injured employee died ___No  If so, give date of death (Submit Form 29) |

Employer name MCGILL ENVIRONMENTAL SYSTEMS        Date Completed  NOV 12 2003

Signed by  JENNIFER MCLAURIN PS        Official Title

**INDUSTRIAL COMMISSION**

54
91
82
49535
SBH

**FORM 19**

FORM 19
6/00
PAGE 1 OF 2

For IC use ONLY
Nature ___
Body ___
Cause ___
SIC ___
Coder ___

MAIL TO:
NCIC - STATISTICS SECTION
4334 MAIL SERVICE CENTER
RALEIGH, NORTH CAROLINA 27699-4334
MAIN TELEPHONE: (919) 733-4820
OMBUDSMAN: (800) 688-6349

STATE OF NORTH CAROLINA

COUNTY OF Sampson

### AFFIDAVIT OF WOODY GILLIS

Being duly sworn upon my oath, I swear and affirm the following:

1.      My name is Woody Gillis. I am a citizen of North Carolina. I am over eighteen years of age.

2.      I am presently employed by the U.S. Department of Agriculture and have been so employed for approximately the last twenty-four years. I am currently working out of the Smithfield swine processing facility in Clinton, North Carolina. I previously worked at the Smithfield Clinton facility until 1989, when I left to take employment with the U.S. government.

3.      I worked part-time for McGill Environmental at the Delway Facility from 2001 to 2004, in addition to my full-time position at the Department of Agriculture.

4.      I had various job responsibilities while employed by McGill, including working as a handyman and cleaning out the bays where the compost was taken after it had been mixed in the pits. At times, I ran the front-end loaders and did other work around the facility, including maintenance work. My job did not involve unloading the tankers or the other trucks that came back to the facilities, but I am familiar with the processes involved.

5.      On one occasion, while working for McGill, I went to Rose Hill where we cleaned out human waste and pumped it into a tanker.

6.      During my years of employment with the Department of Agriculture, I became familiar with animal production operations and odors, gases, fumes, and dusts generated by such operations. Gases and odors are generated from hog and poultry manure decomposition. I have worked not only in a hog processing plant at Smithfield; I also have been in and around chicken

and turkey processing plants, among others. McGill took in wastes from these types of operations.

7.    During the years of my employment by McGill, fumes and gases were a significant problem for McGill. One of the reasons I left that employment was because of my concern for my health working around the gases and fumes.

8.    I am familiar with the rotten egg odor that comes from animal waste. While working at McGill, at times I smelled this gas coming from the pits. McGill would at times take in more waste than it could handle which would cause the pits to be full. While McGill employees worked to reduce the amount of waste in the pits, they could not reduce it enough to completely clean it up. As a result, some of the waste would be in the pits for weeks if not longer.

9.    I also smelled this rotten egg odor coming from the static piles of the compost that was curing in the bays.

10.    I also am familiar with methane gas and ammonia, and at times, while employed at McGill, both of those gases were also present in some of the areas where I worked. At times, the gases and fumes coming from the static piles of materials in the bays were so strong that I either had to leave the area because I had trouble breathing or I couldn't go into the bays because the odors and fumes were so strong.

11.    I specifically recall seeing monitoring devices in the bay similar to the devices I have seen in processing plants to monitor irritants in the air. I was not told the results.

This the _15th_ day of November, 2014.

_[signature]_ Willis
Woody Gillis

Subscribed and sworn before me this _10th_ day of November, 2014.

My Commission Expires: _April 13, 2019_

_[signature]_ Lorene Williams
Notary Public

STATE OF NORTH CAROLINA

COUNTY OF 

## <u>AFFIDAVIT OF FRED HAYES</u>

Being duly sworn upon my oath, I sear and affirm the following:

1.      My full name is Fred Hayes. I am a citizen of the State of North Carolina.  I am over eighteen years of age.

2.      I worked for McGill Environmental at its Delway compost facility in Rose Hill, North Carolina for approximately five years, quitting in approximately 2009.  Before working for McGill, I worked at a hog farm so I am familiar with the odors coming from hog farms and hog wastes.

3.      At McGill, my primary job was to operate the front end loaders, but I also did other things.  The drivers usually unloaded the trucks and the tankers, but there were times when I did it and other operators did it.  To unload the tanker, I had to climb onto the liquid waste tanker trucks when the drivers brought them back, from customer sites including Smithfield. When the trucks and tankers come back, the waste and sludge is unloaded directly over the pit. When I would have to unload the tanker, I would open the hatch on top of the tanker, to let the pressure and the gases out.  I would then open the handle at the back of the tanker and the waste would come out from a hole in the tanker.  On occasions, the liquid waste inside the tanker would be frozen or hard and it would not all come up; at times, I would then have to climb back up on the tanker and put a hose in the open tanker hatch to wash out the remaining sludge and waste in the tanker.

4.     At times, when I would open the hatch on top of the tanker, I would get a blast of gases in my face, coming from inside the tanker. Sometimes the odor would be real bad and it would smell terrible. I have smelled it when it smelled like rotten eggs.

5.     Sometimes, when the tankers returned from Smithfield the sludge pits in the bay would be full. When that happened, the drivers of the tankers would have to leave the tankers in the yard until the bays were cleaned out and the load could be dumped. This would cause even more pressure to build up in the tankers. At times, tankers that were left in the yard had so much pressure in them that the hatch would not open. I have had to take a sledge hammer on occasion to beat off the hatch. The fumes and gas that came out would be very strong. McGill management was aware that this was going on.

6.     The supervisors at Delway knew how bad the fumes and the gases were. On one occasion when I was working, my supervisor was in the bay area with me. We could not see because it was so foggy. It was like when you are driving your car and the fog is so bad that you cannot see in front of you. I remember telling my supervisor that if he fell in this area, with the fumes that bad, it could kill you, and I couldn't see him to get him out. He said, "I know, it can't be good for you."

7.     There were a lot of gases and fumes at the Delway plant. The rotten egg smell was just some of what I smelled. The ammonia smell was terrible at times and it would burn your nose and skin. I am not aware of any air monitoring for any substance ever being done at Delway.

8.     I am not aware of there ever being a safety committee at McGill; if there was one, I never knew about it.

9.  I was never given any training on how to load or unload the tanker; I was never given respiratory protection to wear when I had to open or close the hatch on the top of the tanker; and I was never given any type of harness to keep me from falling off the tanker when the gases came out.

10. The front-end loaders I drove had air conditioning sometimes. The loaders were older equipment and at times the air conditioners did not work. At times, we had to leave the doors open which caused us at times to have to smell and breathe the gases and dusts. Also, at times, we had to shovel the waste materials into the bay if the front end loader wasn't working.

11. I recall the accident involving Robert Jugger when he was overcome by the fumes. I was working at Delway at the time that this happened.

This the 10th day of November, 2014.

Fred Hayes

Subscribed and sworn before me this 10th day of November, 2014.

My Commission Expires: April 13, 2019

Notary Public

STATE OF NORTH CAROLINA

COUNTY OF Sampson

## AFFIDAVIT OF JONATHAN GARDNER

Being duly sworn upon my oath, I swear and affirm the following:

1.    My name is Jonathan Gardner.  I am a citizen of the State of North Carolina.  I am over eighteen years old.

2.    I worked for Smithfield at its Clinton, North Carolina facility from approximately November, 2010 until February 18, 2012.

3.    During this time, I was the crew leader of the waste water operators.  Brandon Taylor and other Smithfield waste operators worked under my direct supervision.  I am familiar with the loading of wastes into the open haul trailers and the tankers because I was present when this was being done, during the day, and at night, and, at times, I personally loaded them.

4.    Both McGill and another company, EMA, were involved in hauling away the wastes that had been belt pressed and dewatered in the open haul trailers.  Both companies provided open haul trucks for the hauling away of the wastes.  In addition to the open top trailers, McGill provided different tankers to load and to transport the liquid waste; EMA had one tanker that it used and it only its tankers to be loaded during the day.

5.    Smithfield's Clinton facility had two operators and sometimes others who were available to help load the waste during the day.  At night there generally was only one waste water operator who usually worked alone at night.  McGill was aware that only one operator would be loading the tankers at night.

6.      The tankers were used to haul away the wastewater sludge stored in four overhead tanks at the Smithfield facility. The waste that was stored into these tanks was more liquid than the waste that had been run through the belt press.

7.      McGill and EMA tankers did not follow the same practices and procedures for the loading of their tankers, and the tankers were equipped differently.

8.      I only recall EMA having one tanker that it sent to Smithfield for loading of the waste from the overhead tanks. There was a short period when EMA also hired a contractor who brought a tanker to Clinton but that was for only a short time and, again, the contractor's tanker was loaded only during the day. In contrast to EMA, McGill sent its drivers to Clinton to load wastewater from the overhead tanks throughout the day and night.

9.      Unlike EMA, McGill used more than one tanker; it had different tankers that it sent to be loaded during the day and at night from the overhead tanks.

10.      The EMA tanker was much easier to load than the McGill tanker. The EMA tanker had the ladder on the driver side. This means that when Smithfield operators loaded the EMA tankers, the operators did not have to climb on top of the trucks to open the hatch. The hatch was opened while standing on the ladder, which was on the drivers' side of the tanker. When loading the EMA tanker, the operator was not standing on the tanker and over the hatch. The operators did not have to stand over the hatch to see if the tanker was full. Further, the operator could reach the circular handle to open the overhead tank valve and commence loading easier from the ladder located on the driver's side of the tanker.

11.      The McGill tanker, however, had the ladder on the passenger side. This meant the Smithfield operators had to physically climb on top of the tanker to open the hatch on it. The McGill tanker had a number of locking clamps on the hatch that had to be opened first and the

operators would have to be physically on top of the tanker over the hatch to open those. The Smithfield operators had to stand over the hatch to watch the liquid going into the tankers to make sure they were not being overloaded. At night when McGill sent its tankers, the lighting was bad and we had to use flashlights because there was no equipment on the McGill tankers to help us know when the tanker load was full. Smithfield would write up the operators if they overloaded the tanker. McGill put no equipment on its tankers to make it easier to load at night. There were never any warnings on the tankers that I saw.

12. When the McGill tankers were loaded during the day, McGill was aware that there were two operators around to assist with the loading. The McGill drivers knew that there was a problem with the fumes coming out of the tankers and that the fumes at times smelled like rotten eggs. On more than one occasion, one of the operators I supervised would get a whiff of the fumes, especially if it was a breezy day, and he would have to come down from the tanker to catch his breath. This would cause a delay in the loading. I would send another operator up onto the tanker to complete the loading. The McGill drivers would be there and they knew that the reason we were substituting the operator on the tanker was because of the strong odors and fumes coming out of their tankers.

13. At times, the McGill drivers would get out of the cabs of the tankers and watch us loading their tankers. They could smell the rotten egg odors just like we could.

14. Brandon Taylor was very safety conscious. It will be my testimony that he was wearing all safety equipment that he was given to wear and that he was following the procedures that were put in place by Smithfield.

This the 11th day of November, 2014.

_____

Jonathan Gardner

Subscribed and sworn before me this _11th_ day of November, 2014.

My Commission Expires: _April 13, 2019_

NOTARY PUBLIC

## AFFIDAVIT OF TIM ARTIS

Being duly sworn upon my oath, I swear and affirm the following:

1.      My full name is Tim Artis. I am a citizen of the State of North Carolina. I am over eighteen years old.

2.      I began working for Lundys, now Smithfield, on October 13, 2005, at the Smithfield Packing plant in Clinton, NC, as a wastewater operator. I last worked for Smithfield on or around February 1, 2013.

3.      The wastewater operators had to drain waste from the overhead storage tanks. These tanks were located at the side of the wastewater department. McGill was the only company that provided tankers at this site to load waste at night.

4.      In February 2010, about two years before the death of Brandon Taylor, I had an incident where I was draining the waste from one of the overhead storage tanks into a tanker owned by McGill and I was seriously injured. My incident happened on or about February 20, 2010. The driver of the McGill tanker that night was Ricky Robinson and he witnessed my injury.

5.      On February 20, 2010, at night, when I climbed on top of the tanker and opened the valve on the overhead tank, a lot of fumes escaped from the hatch and I could not breathe. Ricky was standing outside and was watching me load the tanker. When the gas came out of the hatch, it took my breath away. When the gas came into my face, I ran to the front of the tanker to try to catch my breath. When I got my breath back, I climbed down the ladder, and told Ricky that the fumes were just too strong, that they had taken my breath away and I could not breathe. I told him I was going back on the tanker to shut the valve off and was not going to load it further. Ricky agreed with me. I then climbed back up on the tanker. I had to stand over the hatch where the fumes were coming out, to try to shut off the draining. I turned the valve once and was trying to turn it again, when I felt lightheaded and I lost consciousness.

6.      When my injury occurred, I shared what happened to me with Ricky, who was present, and with Norman Johnson. The fumes were very bad that night.

7.      On that night in question, Ricky pulled the tanker under one of the four big overhead storage tanks. I climbed up on top of the tanker to begin to drain the waste. We were draining from tank 4. Because of where the McGill tanker ladder up the side was located (the passenger side), you could not just stand on the ladder to do the draining, which would keep you further away from the fumes. Instead you had to climb all the way up on top of the McGill tanker where it was very cramped because the big overhead storage tanks came down from above. There was no protection on the top of the tanker to keep me or to keep the drivers for McGill from falling. McGill also had one or more other tankers that had ladders on the other side (the driver's side). EMA was another company with tankers. EMA had tankers that picked up at Smithfield during the day. EMA tankers had the ladders on the driver's side.

1

8. The McGill tankers were old and had a big hatch on top. We had to drain the waste from the overhead tank up above, into the hatch down below. When we opened the big hatch, it was about two feet across and it had no airtight seal, meaning fumes could come out when it was open. We would hook up the pipe from the bottom of the overhead tank so it went into the open hatch. But the pipe was much less wide, meaning there was space between the pipe and the hatch where fumes and gas could come back up out of the hatch of the McGill tanker.

9. The McGill tankers did not have any kind of automatic sensor to warn you once the waste was getting close to the top. So, you had to stand right over the open hatch and use a flashlight to try to see how full it was getting inside. Also the McGill tanker had no warnings about how this was a confined space area, or about how the gas that came from inside could be poisonous. Sometimes, before we loaded waste, Ricky would open the hatch for me, and other times he did not. We climbed up on the ladders the same way that the McGill drivers did and we opened the valves and closed them in the same manner that the McGill drivers did.

10. Sometimes the McGill driver was Ricky, other times it was someone else. The driver never gave us a monitor to wear for gas or a respirator to wear before we climbed up to work on top of the tanker. The driver never climbed up top to "spot" us while we were loading the waste. But, at night, sometimes Ricky would stand outside and talk to us while we were loading the waste.

11. On the night of my incident, February 20, 2010, when I fell unconscious, I fell off the side of the tanker and down to the ground. I was taken to the hospital where I was found to have broken bones and serious back, neck and other injuries. I was out of work for a significant period of time. Despite this incident where I nearly died, afterward McGill kept sending over tankers with the big hatch on top that could allow fumes to escape. McGill still did not put warning signs on the tankers, did not install new equipment, and did not take other safety measures, to my knowledge. Also, I saw Lewis Jackson and Norman Johnson out around the tanks looking at them, several times over the years.

12. In early 2012, about two years after my incident, Brandon Taylor was loading waste just like I had been, into a McGill tanker. It was the same truck driver, and the same overhead tank, and the same kind of night-time work. He was overcome by the fumes and died.

_Tim Artis_
Tim Artis

Subscribed and sworn before me this 27th day of October, 2014.

My Commission Expires: 12/31/2016

_____
NOTARY PUBLIC

Tony E. Smith
Notary Public
Pitt County
North Carolina
My Commission Expires 12/13/2016

2

# AFFIDAVIT OF TIM ARTIS

Being duly sworn upon my oath, I swear and affirm the following:

1.     I have been asked to give some more facts about when I used to drain the waste into the McGill tankers at the Smithfield Packing plant in Clinton, NC.

2.     When we drained the sludge and it was cold outside at night, it could get misty and foggy.  Sometimes inside of the tanker hatch it was foggy as it loaded up with sludge.  Because of this fog, it was hard to see how full it was getting.  The gases would cloud up and smell bad.

3.     When that happened, sometimes I would have to get down real close to the open hatch and try to look in sideways or shine my flashlight in sideways to try to see how full it was getting.

4.     Also, sometimes our goggles would get fogged up making it harder to see what was happening and how full it was getting. Sometimes I would have to take off my goggles so I could see.

5.     After my bad fall when I got hurt, they were making us wear a harness on the tankers.  To get down real close to where the hatch was, you might have to unhook the harness.  It would depend on which tank you were draining.

6.     Sometimes when I was trying to see how full it was getting, I might shine the flashlight close to the hatch if it was foggy and gassy.  The hatch was wide enough that someone could fall in.

7.     To some extent you could get a feel for how long it would take the sludge to fill an empty tanker.  But if you had a tanker that you had already partly filled from one Overhead Tank, and you were filling it the rest of the way from another Overhead Tank, you may have to check more carefully since it would take less time to fill (since it was already partway full).So you have to stay with it.

1

8.    Sometimes if the sludge sat in the overhead tank for a while, when you go to drain it first it came out watery, and then it came out thicker.

9.    Overhead Tank 1 was different from Tanks 2 through 4. Tanks 2 through 4 were built later.

10.   Tank 1 had a hatch on top and when the sludge would expand from gas it would push the hatch open. But Tanks 2, 3 and 4 were sealed all around. You had to cut on an air line in order to push the sludge out when you loaded it. Otherwise only the watery part would come out and not the thicker sludge.

_____
Tim Artis

Subscribed and sworn before me this __17th__ day of December, 2014.

My Commission Expires:    April 13, 2014

_____
NOTARY PUBLIC

2

# AFFIDAVIT OF ULYSSES BOYKIN

Being duly sworn upon my oath, I swear and affirm the following:

1.      My full name is Ulysses Boykin. I am a citizen of the State of North Carolina. I am over eighteen years old.

2.      I began working at the Smithfield Packing plant in Clinton, N.C. on or about July 15, 2010 as a wastewater operator and I am still working for Smithfield at the Clinton plant.

3.      The wastewater operators had to drain waste from the overhead storage tanks. There were four of these overhead storage tanks. These tanks were located at the side of the wastewater department. McGill was the only company that provided tankers at Smithfield to take waste away from the overhead tanks at night. All of the tanks were used to store waste but tank 4 was used far less often than the other tanks. Since the death of Brandon Taylor all the tanks have been torn down.

4.      I used to work with Brandon Taylor before his death in February 2012. My experience working with Brandon Taylor was that he was a safe and trustworthy employee. From what I observed, he tried to be safe in all that he did.

5.      During the month of January 2012, which was the month prior to Brandon Taylor's death, on two different occasions I was injured by fumes coming out of a McGill tanker hatch during loading. The dates of the incidents were January 19 and January 24, 2012. Both incidents occurred on the night shift and while I was loading a McGill tanker.

6.      On January 19, 2012, I was injured when I was draining the waste from tank 2, one of the overhead storage tanks, into a tanker owned by McGill. This tanker was being driven by Ricky Robinson, a driver for McGill. To my recollection, it came in around 5:00 pm and I proceeded to climb the ladder. When I started releasing the sludge into the tanker, the fumes came up from the open tanker hatch into my face. I couldn't breathe and the fumes got into my eyes. Since the fumes came out so strong and so fast, I was concerned that McGill may not have cleaned out the tanker properly before it got to Smithfield.

7.      Attached is the investigation report from the January 19 incident. The only way the wastewater operators could load this McGill tanker was to climb up on top of it. The ladder was on the passenger side. Once the hatch was opened, the operators stood over the hatch to make sure that we did not overload the tanker. There was no loading gauge or porthole or other indicator on the tanker that would alert you to how full it was. You could not see how much was going into the tanker if you were on the ground looking up. You could not look at any gauge on the side. You had to physically stand over the hatch so as not to overload it using a flashlight to try to see how full it was since the McGill tanker had no better equipment to help you.

1

8.      The lighting was poor around where we loaded the McGill tankers and McGill was aware of how poor it was and the conditions under which the loading was taking place. It was especially hard to see how full the tanker was getting at night but McGill would even send tankers there at night and so we had to load them.

9.      When I got hurt the first time, I had to wait until the nurse came on duty at the plant and when she did I reported to first aid because of the pain and the redness I had in my eyes. The fumes coming up out from within the hatch irritated my eyes and after I got down from the tanker, my right eye pain worsened throughout the shift becoming painful and I had blurred vision.

10.     I continued to load McGill tankers with waste out of the overhead tanks after the January 19 incident. I told Ricky Robinson, the driver of the McGill tanker, that this happened to my eyes.

11.     During the loading when Ricky was the driver, at times he would stand out and watch me load; sometimes he would be inside the cab of the tanker. To close the hatch cover, you had to make sure all of the latches around the hatch cover were properly fastened. I wanted to make sure that I loaded the tanker correctly and also that I correctly closed the hatch cover. I often asked the McGill drivers, including Ricky, to make sure that I had properly closed the hatch. They would do that for me which would require them to come up on top of the tanker to make sure I had properly closed down the hatch and that I was correctly loading the tankers. Ricky never mentioned hydrogen sulfide to me and I do not think McGill ever trained him about that gas. When Ricky was helping me to close the hatch he was being exposed to the hazards just like me.

12.     The report of my incident was written by the nurse as I could not see to write it. I reported this incident to Norman Johnson (who was then my supervisor) and also to Susan Melchor. They were both told what I had said in my report -- that the fumes came from the tanker when I was standing over the hatch trying to load it.

13.     On January 24, 2012, I had a second incident of fumes coming out of a McGill tanker into my face when again I was loading the McGill tanker from one of the overhead Smithfield tanks. On that occasion, once again the McGill driver pulled the tanker up under the tanks. I climbed up the McGill ladder which was located on the passenger side of the tanker to load the waste into the tanker. The fumes were strong coming out from within tanker. This occurred at approximately 1:30 am. My eyes were badly irritated and again, I could not breathe and my eyes were painful. This was worse than the January 19 incident. I was again concerned that the McGill tankers were not being washed out. The fumes were again coming out from within the tanker and its open hatch. There was an open space around the hatch that allowed the gas to come from within the tanker into the face of people up on top. I was able to get away from the fumes by unhooking the safety harness that I was attached to.

2

14.     There was not a confined space label on the tanker. If there had been I would have known that there was a problem being up on that tanker and that a confined space permit would have been necessary. I would have talked to the safety department for information. No one told me or to my knowledge, any of the other operators or any of the McGill drivers that the tanker was a confined space. We had also not been trained to suspect that hydrogen sulfide and other dangerous gases could come out of the tanker.

15.     I also never saw a warning label on the side of the tankers saying there was a poison gas risk. If McGill had put on a poison gas warning, once again that would have led me to follow up.

16.     After the McGill tanker driver pulled away on the early morning of January 24, I called Norman Johnson on his cell phone and told him what had happened. I went to the doctor the day of the January 24, 2012, shift when the fumes got into my eyes and I was treated for my eye injury.

17.     The McGill tanker drivers always stayed physically with their tankers.  I am not aware of any instance when I have seen a McGill tanker, that a McGill driver was also not present with it prior to the death of Brandon Taylor.

18.     If McGill had provided a sealed cover or another mechanism to keep vapors from coming up out of the hatch, instead of just a two foot wide open hatch, I believe that would have been safer, since that would have kept fumes and vapors from coming up out of the tanker.

19.     If McGill would have provided me with a portable poison gas monitor to wear before I went up onto its tankers, I certainly would have gladly worn such a monitor, to help avoid an injury.

20.     If McGill had provided a gauge or a porthole on the side of its tankers to show how full the tanker was getting inside, that would have helped me as well. I could have come down and stayed away from the open two foot wide hatch while it loaded.

21.     If McGill had put a label on the side of its tankers that said, Confined Space, permit required, then I would have asked the Smithfield safety department about what the dangers were and what the correct procedure was before I climbed up on the tankers.

22.     If McGill had put a label on the side of its tankers that said, Poison Gas Risk, then I would have asked the Smithfield safety department about what the dangers were and what the correct procedure was before I climbed up on the tankers.

23.     If McGill had instructed its drivers to tell me to wear a respirator before climbing up on its tankers, I would have done so, to better protect myself.

24.     I depended on McGill, as the owner of the tanker, to provide me with adequate safeguards and warnings when I climbed up onto its tankers. If there was a chance that bad chemical gases could come out of the McGill tanker hatch, I would have expected McGill to

3

prevent that from happening and to warn me about it. Unfortunately, by my understanding, McGill did not stop sending the tankers for waste from the overhead tanks, until after the death of Brandon Taylor.


_Ulysses Boykin_
Ulysses Boykin

Subscribed and sworn before me this ___3|st___ day of October, 2014.

My Commission Expires:         April 13, 2019

_____
NOTARY PUBLIC

4